In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-1861

DAVID HAKIM,

*Plaintiff-Appellee,*

*v.*

SAFARILAND, LLC and DEFENSE TECHNOLOGY CORPORATION OF AMERICA,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-6487 — **Thomas M. Durkin**, *Judge*.

———————————

ARGUED OCTOBER 25, 2022 — DECIDED AUGUST 21, 2023

———————————

Before SYKES, *Chief Judge*, and FLAUM and LEE, *Circuit Judges*.

LEE, *Circuit Judge*. In 2014, David Hakim, a SWAT officer for the DuPage County Sheriff's Office ("DCSO"), accidentally got shot by a colleague during a training exercise. The offending projectile was a "breaching" shotgun round

manufactured by Safariland, LLC.[1] Breaching rounds assist law enforcement officers in breaking down doors by disabling hinges and other attachments on doorframes. When used as intended, they disintegrate harmlessly on impact with a metal attachment mechanism. But here, Hakim's fellow officer missed the metal door hinge he was shooting at. The round struck wood, remained live, and ultimately hit Hakim in the spine. Hakim's thirteen-month recovery from his injury required multiple surgeries, and to this day he experiences pain so severe that he has trouble sleeping.

Hakim initiated this diversity action against Safariland under Illinois's law of strict products liability. Hakim claimed that the Safariland round was defective in its manufacture and design, and that Safariland had failed to provide adequate warning that its rounds do not disintegrate if they strike wood instead of metal. A jury found for Safariland on the manufacturing- and design-defect claims, but it awarded Hakim $7.5 million on his failure-to-warn claim. Safariland filed several motions during and after the trial, challenging the sufficiency and weight of Hakim's evidence as well as the size of the award. The district court denied all of Safariland's motions. Safariland now appeals, and we affirm in all respects.

## I.  BACKGROUND

### A.  Safariland's Breaching Rounds and Product Warnings

Safariland's breaching rounds are 12-gauge shotgun rounds made of compressed zinc powder. When an officer

---

[1] The defendants, Safariland, LLC and Defense Technology Corporation of America, merged in 2009. For convenience, we will refer to both defendants collectively as "Safariland."

who needs to enter a room is faced with a locked door, the officer fires the round at the metal hardware that attaches the door to the door frame. When a fired round comes in contact with the metal attachment, the round disintegrates, and the force of the blast destroys or disables the attachment. This allows the officer to enter the room safely without harming anyone who may be inside, including any hostages.

When fired correctly, the rounds are safe. But an errantly deployed round can be deadly. For instance, if a fired round impacts wood (rather than metal), it does not disintegrate and may pierce the wood and remain live, risking harm to anyone in its path. The question we face is whether Safariland adequately apprised its consumers of this risk.

Safariland has issued various product descriptions and warnings describing how to operate the breaching rounds and the risks associated with their use. But none of these materials inform consumers, in so many words, that the rounds do not disintegrate when they hit wood. In fact, the materials sometimes imply that the opposite is true. For instance, the product literature states that the rounds disintegrate on contact with a "hard surface." And Safariland's product catalog lists the breaching rounds on a page labeled "less lethal," and it states that the rounds "[d]isintegrate[] on contact" and are "[s]afe to use at close distances." Indeed, during the trial, one of Safariland's expert witnesses admitted that he had never seen Safariland product literature stating that the rounds must hit metal to disintegrate.

On the other hand, the product literature does tell users how to deploy the rounds safely. It recommends the "45/45" method of deployment, whereby a round is shot into a door 45 degrees out from the door, and at a 45-degree downward

or upward trajectory. The literature also states that rounds should be fired directly at a metal door attachment, rather than at the area between the attachment and the door. The latter technique is known as "shearing." The literature indicates that a proper firing technique will "minimize the risk of the projectile causing serious injury or death."

## B. The DCSO Training Exercise

DCSO purchased some breaching rounds from Safariland; there is no evidence that any DCSO SWAT officers, including Hakim, ever received or read any of Safariland's product literature. The SWAT team used the rounds during a shotgun breaching training exercise conducted at a vacant house in Hinsdale, Illinois on December 11, 2014.

Shotgun breaching training normally takes a full day, but it was rare for the SWAT team to have a vacant house to train in. So, the team heard a thirty-to-sixty-minute presentation and proceeded directly to live firing exercises.

The trainees, including Hakim, split into small groups and randomly selected three doors in the house as breaching stations. Two stations were in the basement and one was on the main floor. There was no coordination or communication between the teams, and there were more teams (three) than certified shotgun breaching instructors (two).

Officer Andrew Alaniz was at one of the basement stations. He was a crack shot with a rifle and a pistol, but he had no experience in using a breaching round. An instructor told Alaniz to try to shear the hinge off the door (contrary to Safariland's instructions). Alaniz did so, but he missed the hinge multiple times. His third shot went through the basement's

ceiling. Unfortunately, Hakim was standing on the main floor of the house in Alaniz's line of fire.

## C. Hakim's Injury and Recovery

The round Alaniz had fired deflected off Hakim's body armor and hit his lumbar spine. He was rushed to the hospital. The district court recounts the immediate aftermath:

> Spinal surgery was necessary to remove the fragments of the round, and the surgeon was only able to remove most of them. Hakim testified the projectile had torn through the dura, which contains the spinal cord and fluid. Because the wound was so large, it could not be stitched, and was instead patched. Because of the patch, Hakim had to lay motionless on his back in the hospital for 48 hours. After he was discharged, his wound became infected and he had to be debrided.[2]

*Hakim v. Safariland, LLC*, No. 15 C 06487, 2022 WL 1136552, at *6 (N.D. Ill. Apr. 18, 2022).

Hakim's suffering did not end there. During his recovery, he was unable to take the necessary amount of pain medication because he was born with only one kidney. *Id.* The incident left Hakim with various ailments, including headaches, chronic pain in his lower back, and radicular symptoms and pain in his lower extremities. To this day, Hakim suffers from

---

[2] Debridement is "the usually surgical removal of lacerated, devitalized, or contaminated tissue." *Debridement*, Merriam-Webster, https://www.merriam-webster.com/dictionary/debridement.

daily pain so severe that he can only sleep four to five hours per night.

These conditions have impacted Hakim's personal and professional life considerably. Although he can walk without an assistive device, he has had to cut back on chores to preserve his strength, and he suffers from a reduced range of motion. Hakim did not return to full-time duty until thirteen months after he was shot. As a SWAT officer, a member of a task force for the United States Marshals Service, and the owner of a martial arts academy, Hakim is required to remain in relatively good physical form. Yet the shooting rendered him unable to pass the SWAT team's running agility test, and he does not believe that he will be able to continue serving on the SWAT team or task force for "more than a few years." While on surveillance assignments, Hakim has to get out of his car every thirty minutes to prevent stiffness.

## D. The Proceedings Below

Hakim brought this diversity action against Safariland under Illinois's law of products liability, alleging that the breaching rounds were defective in their manufacture and design and that Safariland had failed to give adequate warning that the rounds do not disintegrate on contact with wood. *Hakim*, 2022 WL 1136552, at *2. At trial, Hakim offered Safariland's product literature and testimony from his SWAT colleagues, some of whom indicated that they were unaware that the rounds had to hit metal to disintegrate. *Id.* at *4. Two doctors also testified about the nature and extent of Hakim's injuries. Safariland countered with expert testimony from Kenneth Hubbs, a master shotgun breaching instructor, and Weinong Chen, a materials expert, who testified that the rounds

operated as intended and described the proper method of deployment of a breaching round.

Prior to the submission of the case to the jury, Safariland moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The court deferred ruling on the motion pending the jury's verdict. *Id.* at *2. The jury eventually returned a verdict of $7.5 million for Hakim on the failure-to-warn claim, but it found for Safariland on the manufacturing- and design-defect claims. *Id.* Safariland then renewed its motion for judgment as a matter of law under Rule 50(b) and added a motion for a new trial under Rule 59; it also sought remittitur of the $7.5 million award. *Id.* The district court denied all of the motions and entered judgment for Hakim. *Id.* at *7.

## II.  DISCUSSION

We first address Safariland's contentions that the district court erred in failing to grant it judgment as a matter of law or a new trial. We then discuss the district court's refusal to order remittitur of the jury's $7.5 million award. Ultimately, we conclude that the jury's verdict and award should stand in their entirety.

### A. Safariland's Motions for Judgment as a Matter of Law and a New Trial

#### 1.  Legal Standard

A motion for judgment as a matter of law should be granted under Rule 50 when "a party has been fully heard on an issue … and … a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The court must not "make credibility determinations or weigh the evidence," and it must view the

evidence and "draw all reasonable inferences in favor" of the nonmoving party (here, Hakim). *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). We review the district court's denial of Safariland's Rule 50 motions *de novo*. *3M v. Pribyl*, 259 F.3d 587, 595 (7th Cir. 2001).

A new trial may be granted pursuant to Rule 59 "if the verdict is against the clear weight of the evidence." *Whitehead v. Bond*, 680 F.3d 919, 927 (7th Cir. 2012) (cleaned up). While a court adjudicating a motion for a new trial may gauge the weight of the evidence and assess witness credibility, a jury verdict should only be overturned if "no rational jury" could have rendered it. *Id.* at 928 (cleaned up). A district court's denial of a motion for a new trial is reviewed for abuse of discretion. *Id.* at 927.

### 2. Products Liability in Illinois

We apply Illinois's substantive law in this diversity case. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996). Before turning to Safariland's arguments, then, an overview of products liability law in Illinois is helpful.

Under Illinois law, a defendant may be held strictly liable in tort for manufacturing, and placing into the stream of commerce, a product "whose defective condition ma[kes] it unreasonably dangerous to the user or consumer." *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 334 (Ill. 2008). To prove a claim of strict products liability, a plaintiff must establish that he suffered (1) an injury (2) proximately caused by (3) a "condition of the product" that (4) "made the product unreasonably dangerous" and that (5) "existed at the time the product left the defendant's control." *Id.* at 345. There are three types of conditions that may render a product unreasonably

dangerous: a defect in manufacturing, a defect in design, or "a failure of the manufacturer to warn of the danger or to instruct on the proper use of the product." *Id.* at 335. We are concerned here with the third type of defect: failure to warn of a product's dangerous properties.

A failure-to-warn claim will lie if a product "has a latent defect or a dangerous propensity of which a user would normally be unaware," and the defendant does not provide adequate warning of the defect or dangerous propensity. *Baltus v. Weaver Div. of Kidde & Co.*, 557 N.E.2d 580, 588 (Ill. App. Ct. 1990).[3] A product warning may be inadequate if, for example, it does not "specify the risk presented by the product," it is "inconsistent with how the product would be used," it fails to "provide the reason for the warning," or it fails to "reach foreseeable users." *Palmer v. Avco Distrib. Corp.*, 412 N.E.2d 959, 964 (Ill. 1980). The adequacy of a warning is a question of fact typically directed to the jury; of course, the mere fact that warnings were given "is not conclusive [evidence] that the warnings were adequate." *Collins v. Sunnyside Corp.*, 496 N.E.2d 1155, 1158 (Ill. App. Ct. 1986).

---

[3] We cite decisions from Illinois's intermediate appellate courts where appropriate. "Although it is true that only state supreme court cases bind this court, state appellate court decisions nevertheless provide significant guidance." *United States v. Glispie*, 943 F.3d 358, 367 n.13 (7th Cir. 2019).

### 3. Necessity of Expert Testimony

In its motions for judgment as a matter of law, Safariland argued that Hakim's failure-to-warn claim failed because Hakim did not offer any expert testimony to support it. [4]

Many products liability cases involve complicated, technical questions about a product's design or operation. Lay jurors in such cases may have difficulty in determining whether a product has been rendered unreasonably dangerous by an alleged defect. Illinois courts therefore have determined that expert testimony is required to support complex products liability claims in some cases. *Niehaus v. United Seating & Mobility, Inc.*, No. 10-160-GPM, 2011 WL 5325652, at *2 (S.D. Ill. Nov. 3, 2011) ("[G]enerally in product liability and negligence cases involving specialized products and 'specialized knowledge' expert testimony is required.") (citing *Baltus*, 557 N.E.2d at 588–89). [5] Whether expert testimony is necessary is determined by examining the "specific facts and issues involved" in the case. *See Baltus*, 557 N.E.2d at 588–89. So, in

---

[4] Safariland also argues generally that the district court made a procedural error when ruling on its motions for judgment as a matter of law. According to Safariland, the court wrongly considered evidence not introduced during Hakim's case, but in its own case. But Safariland does not explain, nor can we discern, how it was harmed by the court's potentially erroneous consideration of evidence introduced during the defense case. If anything, such consideration would have made it *more* likely that the court would grant Safariland judgment as a matter of law.

[5] We have debated whether, in diversity cases, the necessity of expert testimony in a products liability action is determined by reference to state or federal law. *Show v. Ford Motor Co.*, 659 F.3d 584, 586–88 (7th Cir. 2012). We need not resolve this issue now, since the parties agree that Illinois law controls.

certain failure-to-warn cases, a plaintiff may need an expert to explain why a particular warning is inadequate. But it bears repeating that the adequacy of warnings is most often a jury question. *Collins*, 496 N.E.2d at 1158.

Safariland argues that Hakim needed expert testimony here, because the breaching rounds are specialty products beyond the understanding of a typical lay juror. Safariland emphasizes that the rounds are complex in design and are used by trained law enforcement personnel rather than the general public. It also notes that the rounds have to be fired in the correct way to be effective, and that an ordinary juror would not be aware of the proper deployment method.

But none of these facts are particularly relevant to Hakim's failure-to-warn claim. The fact that the rounds might be complex in *some* respects does not mean that expert testimony is required for *every* products liability claim involving the rounds. For instance, if Hakim's claim was that the rounds were designed defectively, testimony from a ballistics expert or design engineer would probably be necessary. *Show*, 659 F.3d at 587 ("[D]esign options are the province of engineers[.]"). But the jury found for Safariland on Hakim's design-defect claim, and Hakim does not appeal that verdict.

On the other hand, Hakim's failure-to-warn claim presents different factual issues, and the question it raises is rather straightforward: Did Safariland's product literature adequately apprise consumers of the risk that the breaching rounds can remain live after striking wood? Answering this question does not require the application of any specialized, technical knowledge; all the jury had to do was examine the warnings and assess whether they were adequate.

Thus, the cases Safariland cites requiring expert testimony for design-defect claims involving complex products are inapposite. *Show*, 659 F.3d at 587–88 (automobile); *Henry v. Panasonic Factory Automation Co.*, 917 N.E.2d 1086, 1092–93 (Ill. App. Ct. 2009) (industrial machinery); *Cappellano v. Wright Med. Grp., Inc.*, 838 F. Supp. 2d 816, 830–31 (C.D. Ill. 2012) (hip prosthesis). An average juror likely does not possess the specialized knowledge to determine whether a car or medical device was designed defectively, for example. But where warnings, rather than design choices, are at issue, a jury need only determine whether there was a known risk and whether it was sufficiently disclosed. For this reason, numerous courts in this circuit applying Illinois law have not required expert testimony in the context of a failure-to-warn claim. *See, e.g., Africano v. Atrium Med. Corp.*, No. 17-cv-7238, 2021 WL 2375994, at *6–12 (N.D. Ill. June 10, 2021) (holding plaintiff did not need expert testimony to support claim that defendant failed to warn that surgical mesh may not have been sterile, while suggesting expert testimony might have been required on manufacturing- and design-defect claims); *Lott v. ITW Food Equip. Grp. LLC*, No. 10 CV 1686, 2013 WL 3728581, at *1–2, *25, *28 (N.D. Ill. July 15, 2013) (holding expert testimony was not required to support failure-to-warn claim involving food-waste-disposal machine, while indicating such testimony was required to support the plaintiff's design-defect claim).

Admittedly, not all failure-to-warn claims are so straightforward. Some product warnings are communicated exclusively to trained specialists, who possess esoteric knowledge beyond the experience of the average juror. In such cases, expert testimony may be necessary for a jury to determine how a reasonable specialist in the relevant field would interpret the warning. Take, for example, cases involving drugs and

medical devices, where a lay juror untrained in medicine would be unable to comprehend the meaning of the warnings themselves. *See, e.g.*, *Sosnowski v. Wright Med. Tech., Inc.*, No. 11 C 59, 2012 WL 1030485, at *7 (N.D. Ill. Mar. 27, 2012) (holding expert testimony was required on failure-to-warn claim involving hip prosthesis); *N. Tr. Co. v. Upjohn Co.*, 572 N.E.2d 1030, 1038–39 (Ill. App. Ct. 1991) (holding expert testimony was required in determining whether warning label on medication adequately disclosed risk of cardiac arrest).

Safariland urges us to adopt a similar rule here, arguing that the law enforcement officers to whom the breaching rounds are marketed are "specialists." But it is not the characteristics of the audience to whom the warning is directed that is dispositive, but whether a lay juror would understand the nature of the relevant risk and the substance of the warning at issue absent expert testimony. *See Upjohn*, 572 N.E.2d at 1036 (indicating that expert testimony is not required where a jury can "reach an intelligent conclusion about the adequacy of the warning without the aid of an expert's specialized knowledge"). Here, the risk is that the breaching rounds, when they strike wood, do not disintegrate; this is well within the comprehension of a layperson. Indeed, as Hakim points out, there is no evidence that law enforcement personnel are any more familiar with the physical or kinetic properties of breaching rounds than an average consumer.[6] In sum,

---

[6] We note here that Safariland put on its own experts, who testified about the material composition of the breaching rounds, as well as how to deploy the rounds. It is not clear to us why Hakim would need to present more expert testimony covering the same issues to support his case.

Hakim's straightforward failure-to-warn claim did not re-
quire expert testimony.

### 4. Adequacy of Safariland's Warnings

Next, Safariland argues that the district court should have
granted it judgment as a matter of law because its warnings
were adequate. Alternatively, it contends that the jury's deci-
sion that its warnings were inadequate was against the weight
of the evidence and, therefore, that a new trial was war-
ranted.[7]

Safariland acknowledges that none of its product litera-
ture specifically warns that breaching rounds that hit wood
do not disintegrate. But it argues that this danger was implied
in its literature. For instance, Safariland notes that the docu-
ments advise shooting the rounds directly at metal attach-
ment mechanisms, rather than attempting to "shear" those
mechanisms off a door, to "minimize the risk of the projec-
tile[s] causing serious injury or death." But other statements
in the literature seem to indicate that the rounds will disinte-
grate on contact with wood. For instance, the literature states
that breaching rounds "disintegrate[] into a fine powder"

---

[7] Safariland also argues that the district court abused its discretion in
rejecting its motion for a new trial because it did not thoroughly weigh the
evidence and did not point out any specific inadequacies in the product
warnings. But the district court clearly articulated its basis for denying Sa-
fariland's motion for a new trial: "gaps and inconsistencies" in Safari-
land's product warnings, which could have led a reasonable jury to con-
clude that Safariland had failed to warn of its product's dangerous pro-
pensity. *Hakim*, 2022 WL 1136552, at *5. While the district court's discus-
sion could have been more thorough, this statement is sufficient to sup-
port meaningful appellate review. *See United States v. Pulliam*, 973 F.3d
775, 786–87 (7th Cir. 2020).

upon contact with a "hard surface." A reasonable consumer certainly could interpret the term "hard surface" to include wood.

Adding to the confusion is Safariland's product catalog. The catalog features the breaching rounds on a page labeled "less lethal" and states that the rounds "[d]isintegrate[] on contact" and are "[s]afe to use at close distances." A reasonable jury could interpret these statements as conveying the false impression that the breaching rounds are not particularly harmful, even when misfired. Therefore, the jury reasonably could have found Safariland's warnings inadequate. Safariland is not entitled to judgment as a matter of law or a new trial on this basis.[8]

### 5. Causation

Finally, Safariland appeals the district court's denial of its motion for a new trial on the issue of proximate causation. In its view, Hakim's injury was caused solely by the SWAT

---

[8] Safariland makes some additional arguments here that do not warrant significant discussion. First, it argues that the testimony of several DCSO SWAT officers indicates an understanding among the officers that breaching rounds must hit metal targets to disintegrate. We struggle to see how this evidence is legally relevant to Hakim's failure-to-warn claim, since Safariland admits that none of the SWAT officers received or read Safariland's product literature. In any event, at least one officer testified that he believed the rounds would disintegrate on striking wood, and the jury was entitled to credit this testimony. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). Second, Safariland asserts that the testimony of its experts was unrebutted, and that the DCSO SWAT team was shown a video of how to properly deploy breaching rounds. But as the district court correctly observed, the jury was not "required to draw specific inferences from the evidence in [Safariland's] favor and disregard conflicting evidence." *Hakim*, 2022 WL 1136552, at *4.

team's sloppily conducted training exercise, and the jury's contrary verdict was against the weight of the evidence.

"Proximate cause encompasses two requirements" under Illinois law: "cause-in-fact and legal cause." *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 309 (7th Cir. 2010) (citing *Young v. Bryco Arms*, 821 N.E.2d 1078, 1085–86 (Ill. 2004)). A defendant's conduct is a cause-in-fact of a plaintiff's injury if the conduct "was a material element and a substantial factor in bringing about the injury." *Lee v. Chi. Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992). Legal causation, meanwhile, is a question of foreseeability. *Id.* at 503. It exists so long as the plaintiff's injury was a reasonably foreseeable result of the defendant's conduct. *Id.* Proximate causation is typically a question for the jury. *Williams v. Univ. of Chi. Hosps.*, 688 N.E.2d 130, 134 (Ill. 1997); *Mack v. Ford Motor Co.*, 669 N.E.2d 608, 613 (Ill. App. Ct. 1996).

Here, Safariland spends pages rehashing how, in its view, the trial evidence suggested that DCSO acted improperly, but provides virtually no legal analysis to support its position as to proximate cause. It cites a grand total of two cases, neither of which provide any help in resolving the issue. Indeed, Safariland fails to address any number of legal questions relevant to proximate cause. For example, under Illinois law, an injury may have multiple proximate causes. *Mack*, 669 N.E.2d at 613. Here, even assuming Safariland is right that DCSO was negligent, it is not clear why Safariland's own failure to warn would not constitute an *additional* proximate cause of Hakim's injuries, subjecting it to liability. Safariland's arguments are wholly lacking, and we have made clear that such "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Crespo v.*

*Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).[9]

## B. Damages

Finally, Safariland appeals the district court's denial of its motion for remittitur of the $7.5 million award or, in the alternative, a new trial. Our review is for abuse of discretion. *Rainey v. Taylor*, 941 F.3d 243, 252 (7th Cir. 2019). We apply Illinois law in determining whether Hakim's damages were excessive. *Id.* at 253.

Under Illinois law, an award of damages is excessive only if it "falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Richardson v. Chapman*, 676 N.E.2d 621, 628 (Ill. 1997). And a jury's verdict is accorded significant deference. *Id.* This is particularly true in personal-injury cases, where the precise dollar value of a person's pain and suffering is difficult to measure. *Snelson v. Kamm*, 787 N.E.2d 796, 816 (Ill. 2003). Nevertheless, Illinois law does list some factors for us to consider, including the

---

[9] To the extent that Safariland argues elsewhere that it is entitled to judgment as a matter of law because neither Hakim nor his fellow officers read Safariland's warnings, this is an incorrect statement of law. Where a defendant sells a product to a purchaser, who then distributes that product to an end user, the defendant may still be liable in certain circumstances to the end user for failing to provide adequate warnings to the purchaser, even where the end user did not read the warnings. *See, e.g.*, *Solis v. BASF Corp.*, 979 N.E.2d 419, 439–40 (Ill. App. Ct. 2012); *Venus v. O'Hara*, 468 N.E.2d 405, 408–09 (Ill. App. Ct. 1984).

"permanency of the plaintiff's condition, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries." *Richardson*, 676 N.E.2d at 628.[10]

Here, the jury's award was rooted in the substantial evidence of Hakim's pain and suffering. Hakim has been diagnosed with various chronic, and seemingly permanent, medical conditions as a result of the shooting, including back pain, pain in his lower extremities, stiffness, an abnormal lumbar extension, and reflex and balance issues. He experiences daily pain, and he is limited in the pain medications he can safely take. His pain is often so severe that he can only sleep four to five hours a night. Moreover, the evidence indicates that Hakim's condition may deteriorate in the future: he is at risk for additional spinal trauma, and he doubts that he will be able fully to perform his physically demanding law enforcement jobs "for more than a few years." And the jury heard that Hakim's injuries seriously restrict his personal and professional activities. As a result of the shooting, Hakim is not able to pass all SWAT performance and agility tests, and he needs to get out of his car every half-hour while on surveillance assignments so that he does not become stiff. At home, Hakim has

---

[10] We pause briefly to reject Safariland's argument that the district court applied the wrong legal standard to its remittitur motion. The district court denied remittitur because the jury's award was "not irrational." *Hakim*, 2022 WL 1136552, at *6. Safariland replies that the standard for remittitur under Illinois law is excessiveness, not irrationality. *See Richardson*, 676 N.E.2d at 113–14. But any award that falls "outside the range of fair and reasonable compensation," results from "passion or prejudice," or "shock[s] the judicial conscience," *id.*, would accurately be described as irrational. In any case, the district court was clearly aware that Illinois law governed and applied it correctly. *See Hakim*, 2022 WL 1136552, at *6–7.

difficulty walking, and he has had to cut back on chores to conserve his strength.

Based on this evidence, the jury's award of $7.5 million, while perhaps on the high side, was not unreasonable or unfair.[11] The district court therefore did not abuse its discretion in denying Safariland's motion for remittitur or a new trial.

### III.  CONCLUSION

We have considered Safariland's remaining arguments, and none have merit. For the reasons stated above, the judgment of the district court is AFFIRMED.

---

[11] Safariland also points to certain comments by Hakim's counsel during trial to argue that the award was based on "passion or prejudice," rather than evidence. *Richardson*, 676 N.E.2d at 628. Given our determination that Hakim's award was within the range of fair and reasonable compensation for his injuries, however, we have no basis to conclude that the award was the result of passion or prejudice. *Dresser Indus., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448–49 (7th Cir. 1992) (applying Wisconsin law) (noting that "a finding that damages were not monstrously excessive or unsupported by the evidence necessarily precludes a finding of passion and prejudice"). Nor does the fact that the jury awarded more damages than Hakim's counsel requested mandate such a finding. *Fedt v. Oak Lawn Lodge, Inc.*, 478 N.E.2d 469, 478 (Ill. App. Ct. 1985) (sustaining jury award of $1 million, even though counsel had requested $600,000).